1  Michael Cohen - #98066
   Bruce E. Krell, Inc. - #52542
2  Jerome M. Garchik - #50562
   LAW OFFICES OF BRUCE E. KRELL
3  Grove Law Building
   345 Grove Street
4  San Francisco, CA 94102
   415/861-4414
5  Fax: 415/431-4526
   mikecohen@sprintmail.com
6
   Attorneys for Plaintiff
7

8       UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

9  WILLIAM E. KNIGHT,                    No. CV 11 6337 - JST

10       Plaintiff,                      **DECLARATION OF MICHAEL COHEN IN**
                                         **SUPPORT OF PARTIAL SUMMARY**
11  vs.                                  **JUDGMENT**

12  DIANE AQUI, MARK D. JORDAN,          DATE: 9/5/13
    Deceased, ESTATE OF MARK. D.         TIME: 2:00 P.M.
13  JORDAN, and DOES 1-100,              COURTROOM 9, 19th Floor

14       Defendants.

15  _____/

16       I, MICHAEL COHEN, say:

17       1.      I am an attorney duly licensed to practice in the Courts of the United States of

18  America, and am one of the attorneys for Plaintiff.  I know the following firsthand; and, if called

19  upon to testify thereto, I could and would do so competently.

20       2.      Attached hereto and incorporated herein as Exhibit "A" are the first three pages of

21  the 7/5/13 deposition of Plaintiff's expert, Matthew White.

22       3.      Attached hereto and incorporated herein as Exhibit "B" is the Curriculum Vitae of

23  Mr. White, produced and made an exhibit to said deposition.

24       4.      The following are true and correct excerpts from said deposition:

25           a.      47/33-48/7:
    33  Q.   What do you mean when you say, "They're
26  34
    35  jointly responsible as a matter of custom and practice"?

                                        1

_____

36
37     A.   I worked on a lot of cases with other lawyers,
38
39 and we work -- you know, the client pays once.  The
40
41 obligation is to the lawyers, whether there's two or
42
43 three or 10 of us.
44
45        If money is owed to the clients, it's up to us
46
47 to squabble among ourselves; but we, as a unit, owe the
48
49 money to the client.  That's the way I would perceive
50
51 it.
52
53     Q.   This is based on your experience and however
54
55                                47
0048
1
2
3
4
5 number of years you've practiced as a lawyer?
6
7     A.   Correct.
        b.     48/15-52/33:
15     Q.   In the next subparagraph there, number b, the
16
17 letter B, the second sentence says that you note that
18
19 the promise was not secured or guaranteed.
20
21        Is there any particular significance to that
22
23 comment?
24
25     A.   Yes.
26
27     Q.   What is that?
28
29     A.   With a formal, structured settlement or
30
31 something with the reasonable guarantee of payment, the
32
33 picture is different.
34
35        The client -- if the client and a lawyer agree
36

2

1  37  that the settlement can be evaluated, and the lawyer can
   38
2  39  be paid up front, that's custom and practice.  But when
   40
3  41  it's an unsecured promise to pay, it's a whole different
   42
4  43  situation.
   44
5  45      Q.   And why is that?
   46
6  47      A.   Well, the promise to pay has a value, but it's
   48
7  49  not 550.  When a -- you know, a promise to pay is worth
   50
8  51  what somebody else would buy that note.  Nobody would
   52
9  53  pay face value for it, especially not something that's
   54
10 55                                48
   0049
11  1
    2
12  3
    4
13  5  going to be paid over time.
    6
14  7          But if the client and a lawyer agree that they
    8
15  9  would up-front pay the lawyer's fee and the client would
   10
16 11  take what was left with an unsecured, unstructured
   12
17 13  settlement, then we would need to evaluate what that
   14
18 15  $550,000 note actually was, and the lawyer could take a
   16
19 17  40 percent fee on that.  But it wasn't structured, it
   18
20 19  wasn't insured, and nobody got an evaluation.
   20
21 21      Q.   So are you saying that it would have been in
   22
22 23  your opinion okay if the -- if there was a present value
   24
23 25  analysis of Doubleshot's obligations that it would have
   26
24 27  been okay to take a 40 percent contingency fee on the
   28
25 29  present value of that promise?
   30
26 31      A.   Not just present value, because present value
   32

3

1    33    over a two- or three- or four-year payment is not going
     34
2    35    to reduce it much.  But this is a junk bond.  It's an
     36
3    37    unsecured note by a company with no guarantee of future
     38
4    39    profitability.  So you would have -- number 1, it would
     40
5    41    have to be fully explained and understood by the client
     42
6    43    and agreed by the client.
     44
7    45         Number 2, you'd not only have to reduce it at
     46
8    47    present value, you'd have to reduce it for the risk that
     48
9    49    there would be no payments.  And I don't know who would
     50
10   51    pay, who would have bought this note for anything close
     52
11   53    to 550.  Probably nobody.
     54
12   55                                49
     0050
13    1
      2
14    3
      4
15    5    Q.  "It was not an insured annuity."
      6
16    7         What is the significance of that statement?
      8
17    9    A.  Well, my understanding is that Miss Aqui said
     10
18   11    that when she first got out of law school, she had
     12
19   13    worked -- you want to take a time-out here for --
     14
20   15         (Interruption to proceedings.)
     16
21   17         THE WITNESS:  It's my understanding that
     18
22   19    Ms. Aqui had worked for a personal injury firm right out
     20
23   21    of law school and had observed a couple of occasions
     22
24   23    where the firm had taken a fee up front, and that was
     24
25   25    the basis of her understanding that it was okay.
     26
26   27         But it is my understanding that those
     28

                            4

1  29  circumstances were insured annuities or formal,
   30
2  31  structured settlements.
   32
3  33      MR. HAAS:  Q.  But what's the significance of
   34
4  35  the fact that it's not an insured annuity or formal,
   36
5  37  structured settlement?
   38
6  39    A.  That it's not worth anywhere near $550,000.
   40
7  41      The lawyer has -- it's not appropriate to base
   42
8  43  a fee on a figure on the face value of a note.  You
   44
9  45  know, an insured annuity, if the insurance company, you
   46
10 47  know, is Triple A rated, it's going to be worth a lot
   48
11 49  closer to 550.  But even then it has to be reduced to
   50
12 51  either present value or what somebody would have paid
   52
13 53  for it.
   54
14 55                              50
   0051
15 1
   2
16 3
   4
17 5      The significance of that is pretty much the
   6
18 7  same significance as the sentence before.
   8
19 9    Q.  Does that have to do with the risk or chances
   10
20 11  that the payments are actually going to be made; is that
   12
21 13  what you're saying?
   14
22 15    A.  I'm saying that, in my experience, I have
   16
23 17  never heard of or talked to anybody who referenced
   18
24 19  taking a full fee on a promise to pay, because a promise
   20
25 21  to pay is worth significantly less than the face value
   22
26 23  unless it is secured or guaranteed or insured or in some
   24

5

1  25  way reasonably likely to be paid.
   26
2  27      If it's just a promise to pay, the promissory
   28
3  29  note has a value far less than the face value.  And it
   30
4  31  would be below the standard of care for an attorney to
   32
5  33  not know that and to take a full fee on the promise,
   34
6  35  leaving the client to take the risk that further
   36
7  37  payments would be made.
   38
8  39      Q.   Okay.  What's the standard of care that you're
   40
9  41  referring to?
   42
10 43      A.   The standard of care would be the -- wait.  Do
   44
11 45  you want to know a generic definition of the standard of
   46
12 47  care?
   48
13 49      Q.   Now you're referring to a standard that it
   50
14 51  would be below the standard of care to take a fee under
   52
15 53  those circumstances.
   54
16 55                                       51
   0052
17  1
    2
18  3
    4
19  5      What standard of care are you referring to?
    6
20  7      A.   I hope I'm understanding your question.  I'll
    8
21  9  answer it; and if I didn't, you can tell me, and I'll
   10
22 11  try it again.
   12
23 13      Q.   Fine.
   14
24 15      A.   A reasonable lawyer, with appropriate care and
   16
25 17  experience, would know that a promise to pay an
   18
26 19  unsecured promissory note is worth far less than the
   20

6

1  21  face value.
   22
2  23       And a reasonable lawyer in our community,
   24
3  25  acting with due care, would either take the fee as it
   26
4  27  comes in, as it is realized, or would reach an agreement
   28
5  29  with the client to have the promissory note evaluated,
   30
6  31  and then take a fee on that if the client wished to do
   32
7  33  it, which would be surprising, a fully informed client.

8           c.     53/29-39
   29  A.  Yeah.  I think a lawyer has an obligation to
9     30
   31  understand the basic rules; or if she doesn't, to go
10     32
   33  find out what they are.  It's easy enough.  Then,
11     34
   35  bearing in mind, that she has a fiduciary duty based on
12     36
   37  her client's trust in her, to make sure she's doing it
13     38
   39  right.

14           d.     62/19-63/25:
15  19  Q.  The last sentence of 9(a) says:
   20
16  21       "It was below the community standard of
   22
17  23  care for Miss Aqui to calculate her fee on the
   24
18  25  total promised amount and then take the full
   26
19  27  fee from partial payments made by the debtor."
   28
20  29       Again, what standard of care are you referring
   30
21  31  to?
   32
22  33  A.  The practice of a reasonably, competent,
   34
23  35  careful lawyer in the nine county Bay Area, with -- I'm
   36
24  37  not sure, but I don't want to be circular here.  Maybe I
   38
25  39  should ask you more specifically what you want.
   40
26  41  Q.  Here's what I'm trying to get.  We may have
   42

7

1    43   gone over this a little bit earlier.  But you're basing
     44
2    45   it on your years of experience as a plaintiff's lawyer,
     46
3    47   that's how you're defining the standard of care based on
     48
4    49   that?
     50
5    51      A.  Yes.  And I want my experience as a
     52
6    53   plaintiff's lawyer to be broader than that:  my
     54
7    55                  62
     0063
8     1
      2
9     3
      4
10    5   interactions with other lawyers, my work at the courts,
      6
11    7   my participation in the list, my informal conversations
      8
12    9   with lawyers at coffee shops.
     10
13   11      If all that's built into my experience, then
     12
14   13   that's the basis for my opinion.
     14
15   15      Q.  Okay.  And it's that experience as opposed to
     16
16   17   any legal research that you may have done?
     18
17   19      A.  Other than the snippets that we've talked
     20
18   21   about.
     22
19   23      Q.  Okay.
     24
20   25      A.  And I should add, also, because I wanted to
     26
21   27   make sure that it wasn't just me, I asked the three
     28
22   29   respected lawyers.
     30
23   31      Q.  Sure.
     32
24   33      A.  Most of them, they didn't let me finish.  It
     34
25   35   was really obvious to them, too.

26          e.      64/5-53:
    5      Q.  Let's go to the next page, subparagraph (b).

8

You make a comment there about -- at the end

of that:

"As contingency fees lawyers in the

community" --

Let me start over again.  I think I got it a

little jumbled.

"As contingency fee lawyers in the

community only take the contract percentage of

the collected portion of a non-annuity

settlement or judgment, there is no reason to

research the rule that requires them to do

so."

Are you aware of instances where you have seen

a fee that was paid on the portion of the settlement

that hasn't been collected or wasn't collected?

A.   Only in a structured or annuity.

Q.   That's the only ones that you're aware of?

A.   Correct.  And I've talked a lot about personal

injury.  In the early part of my practice, my firm

represented collection agencies.  And there were

promises to be paid every day, but we only got paid --

and I believe the standard of care required us only to

get paid -- when the debtor actually made the payment,

which was far less than always.

       f.     65/5-66/49

Q.   Subparagraph (d) on that page, the second

Declaration of Michael Cohen in Support of Partial Summary Judgment

1    7   sentence says:
     8

2    9      "Unless otherwise specified in the
   10

3    11   contract, the fee due to each are indivisible
   12

4    13   and unallocated."
   14

5    15     What's the significance of that comment?
   16

6    17     A.   My understanding is that the defendants in
   18

7    19   this case are saying, Well, only part of it would be
   20

8    21   owed by me.  If someone else made you a promise, go get
   22

9    23   it from him.
   24

10    25     And I'm basing that again on my experience,
   26

11    27   where I've worked together with many lawyers, many
   28

12    29   times.  And it's never been a separate arrangement where
   30

13    31   the client owed me part of the fee and owed the other
   32

14    33   lawyer part of the fee.  If the fee is a third, it's up
   34

15    35   to the lawyers to divide it up.
   36

16    37     And I point out also what I -- the
   38

17    39   retaining -- the contract doesn't allocate it in any
   40

18    41   way.  It just says that she is -- that he, Mr. Knight,
   42

19    43   is retaining Jordan/Aqui, and there's no allocation that
   44

20    45   he's going to owe one of them for part and the other for
   46

21    47   the other part.
   48

22    49     Again, it's on a contingency.  It's not like
   50

23    51   I'll pay Jordan for the work he does, and I'll pay Aqui
   52

24    53   for the work she does.  It's an unallocated contract.
   54

25    55             65
   0066

26    1
   2

Declaration of Michael Cohen in Support of Partial Summary Judgment

Q.   So are you saying that to the extent that the

plaintiff is found to be entitled to recovery of some

portion of what was paid here that either Mr. Jordan or

Ms. Aqui would be liable for the entire amount?

A.   That would be my general understanding.  But

more important is it's between Jordan and Aqui.  In

other words, if the money that was improperly taken is

returned to Mr. Knight, as it should be, it's going to

be up to Mr. Jordan and Ms. Aqui to straighten out who

is responsible for that, who has already received how

much.  That's not really the issue from Mr. Knight's

perspective.

Q.   Okay.  Is that part of what you've been asked

to render opinion here about?

A.   Yes.  Again, not the legal conclusion or the

law.

It's the custom and practice which, in my

experience, when lawyers work together on a contingency

fee contract, there's one fee, and it's owed to the

lawyers, and the lawyer -- it's up to the lawyers how

they want to divide it up.  And so I have to presume

that if it were going the other way, it would be the

same rule.

g.     67/39-68/11:
THE WITNESS:  I'll clarify.  It's my

understanding that expert witnesses are not allowed to

11

42
43  tell the judge what the law is, and so I'm not going to

44
45  do that.

46
47       My role, as I understand it, is to share my

48
49  experience, knowledge, education, training as to how

50
51  lawyers in our community do things.

52
53       And it's my understanding, based on my -- or

54
55                                    67
0068
1
2
3
4
5  my opinion, I should say, is that there's an indivisible

6
7  fee owed by the client to the lawyers, and it's a --

8
9  between them.  The custom and practice is for them to

10
11  work it out.  It's not the client's problem.

        h.      73/11-74/31:
11  A.   The rules of paragraph (a) are designed to set

12
13  the stage for an attorney's standard of care.  And I

14
15  think it's a standard of care for a lawyer either to

16
17  know these basic rules or to go out and figure them out.

18
19       So, when an ambiguity arises in the contract,

20
21  if there is ambiguity, it's up to the lawyer to know

22
23  these rules and to do the research.  I mean, you're in a

24
25  situation where she, or they, are about to interpret a

26
27  contract to their benefit to the detriment of their

28
29  client.  That should ring bells in their minds.

30
31       A careful attorney in this community, probably

32
33  anywhere in the world, at that point would have to

34

                                    12
_____

1   35   think, Wait a minute.  I owe my client a duty of good
    36
2   37   faith and fair dealing.  I owe them a fiduciary duty.  I
    38
3   39   recognize that any contract could be interpreted against
    40
4   41   me because I'm the one that wrote it.
    42
5   43        And then it would be below the standard of
    44
6   45   care to just blow all that off and say, "Nonetheless,
    46
7   47   I'm going to interpret it the way I want and take all
    48
8   49   the money."
    50
9   51        That's the basis for that paragraph.
    52
10  53        Q.   But it sounds to me like you don't think that
    54
11  55                                73
    0074
12   1
     2
13   3
     4
14   5   there is an ambiguity because the word "realized" is
     6
15   7   clear; it means dollars in hand?
     8
16   9        A.   Correct.  And I'm giving her, or them, the
    10
17  11   lawyers, in this case, the benefit of the doubt for the
    12
18  13   purpose of this paragraph which is -- I don't think it's
    14
19  15   at all ambiguous -- but if it is in the slight-  if they
    16
20  17   believe it's ambiguous.
    18
21  19        Even if they believe it's ambiguous, they
    20
22  21   should still know these rules and go out and find out
    22
23  23   what they're supposed to do, ask around, check the State
    24
24  25   Bar, talk to other lawyers, do some research.
    26
25  27        And my understanding, they did none of that.
    28
26  29   They just interpreted the contract the way they wanted
    30

13

31   it interpreted and took all the money or most of it.

            i.      74/53-76/9:

53   Q.   All right.  Let's go to the next page, 8,

54

55                                 74

0075

1

2

3

4

5   subparagraph (f) there.

6

7         You talk about a competent attorney would bear

8

9   in mind her fiduciary and ethical obligations to her

10

11   client.

12

13         What fiduciary and ethical obligations are you

14

15   referring to there?

16

17   A.   To -- I mean, it could cover a lot.  But,

18

19   specifically, I think we're dealing with the lawyer

20

21   who's about to take a fee, on the first payment or two

22

23   payments should be thinking, or should be aware that

24

25   wait a minute, am I doing the right thing by my client?

26

27   Am I following my contract?  Am I following the State

28

29   Bar rules?

30

31         You know, am I -- and it's either that she

32

33   just took the money, or that she was unaware of the

34

35   basic rules that required her to not take the money

36

37   either way.

38

39         So it appears to me that she was not aware of

40

41   and misinterpreted the basic rules regarding fee

42

43   contracts.

44

45         And before you -- and this is just what I said

14

46
47   earlier basically -- before she interprets the contract
48
49   to her benefit, she has an obligation to know the basic
50
51   fiduciary rules, the basic ethical obligations, the
52
53   basic meanings of words in the English language.
54
55                                                    75
0076
1
2
3
4
5           And not doing that, not paying attention to
6
7   that, or not being aware of that is a violation of her
8
9   duty to the client, and it's below the standard of care.

              j.       76/41-77/51:
41   she -- what I'm trying to -- what I intended to suggest
42
43   is that she doesn't know the rules.
44
45           She said in her deposition she had never
46
47   handled an installment payment claim before.  She sort
48
49   of seen a couple of them that turned out to be
50
51   structured settlements at her old firm.  She clearly
52
53   doesn't have experience with or understand the basic
54
55                                                    76
0077
1
2
3
4
5   rules of getting paid on installment contracts.
6
7           So, in the event that she doesn't know, that's
8
9   fine.  Nobody knows everything.  But if she doesn't
10
11   know, it's her obligation, it's her duty, the standard
12
13   of care requires that she go out and figure it out.
14

15      It would not have been difficult to pick up
16
17  the phone and talk to anybody who's handled these types
18
19  of cases.  Call the State Bar ethics hotline.  Do
20
21  something.
22
23      But it seems to me that she went ahead and did
24
25  what she shouldn't have done based on her ignorance of
26
27  the rules -- and that's a violation -- and the way I'm
28
29  reading the State Bar Rules of Professional Conduct.
30
31  Q.  Okay.
32
33  A.  But it's, also, you know, the State Bar rules
34
35  are only -- it's just really a very limited set of rules
36
37  that apply to lawyers.
38
39      Lawyers have to do the right thing.  They have
40
41  to -- none of us know everything.  And I'm always
42
43  picking up the phone and asking somebody to help because
44
45  I haven't encountered a particular problem before.  It's
46
47  what lawyers in the community do.
48
49      It's my opinion that she should have done that
50
51  in this case before she took the money for herself.

k.      78/23-37:
23  is, we, as lawyers, can't know everything.  If we don't,
24
25  we have an obligation to go and find out.  So it could
26
27  be that somebody technically will conclude that this
28
29  particular rule doesn't apply.  I don't know.  To me,
30
31  it's an indication of the standard of care.
32
33      I read it to read, very generally, if you
34
35  don't know what you're doing, go out and figure out what

16

36
37   the rules are or get somebody to help.

l.        81/15-82/37:

15   is, any belief that the lawyers had a right to this
16
17   money is inherently a violation of their standard of
18
19   care because it's so obvious just from the reading of
20
21   the contract that they don't have that, that if they --
22
23   if they believed they had a right to that money, then
24
25   we're going to have to go back and talk about everything
26
27   else:  about their obligations to their clients and
28
29   their obligation to look up things if they don't know
30
31   the answer.
32
33          And subjective perspective, maybe if we were
34
35   dealing with punitive damages or -- you know, to try and
36
37   decide whether they go to heaven or hell would be a
38
39   whole different issue.
40
41          But their subjective views are not the issue.
42
43   They're obligated to do the right thing; and if they
44
45   don't know the right thing, they got to go find out what
46
47   it is.
48
49          MR. HAAS:  Q.  That's what I'm trying to find
50
51   out.  You obviously have a very strong opinion about
52
53   that.  I get that.  But assume hypothetically that the
54
55                              81
0082
1
2
3
4
5   contract is ambiguous, and that the lawyers do have a
6

1   7   good faith belief that they're entitled to more, do you
    8
2   9   have an opinion about, under those circumstances, what
    10
3   11  the lawyers should have done?
    12
4   13      A.   Yeah.  They should have called the State Bar,
    14
5   15  or they should have called friends, or they should have
    16
6   17  looked it up.  And failure to do that is negligent.
    18
7   19      Q.   And what do you mean by "look it up"?
    20
8   21      A.   Look in the Rutter Group, look in the State
    22
9   23  Bar rules, look in the cases, in the authorities, do a
    24
10  25  little research.
    26
11  27          There's a lot of money.  And it's the client's
    28
12  29  money.  And before they take money that's conceivably
    30
13  31  owed to their client, they need to know that they're
    32
14  33  doing the right thing.
    34
15  35          They don't appear to have made any effort
    36
16  37  whatsoever to make sure they were doing the right thing.

17

18          5.      Attached hereto and incorporated herein as Exhibit "C" are the first three pages of

19      the 12/6/12 deposition of Defendant Aqui.

20          6.      Attached hereto and incorporated herein as Exhibits "D","E" and "F", are true and

21      correct copies of exhibits 1, 2 and 4 to said deposition

22          7.      The following are true and correct excerpts from said deposition:

23              a.      4/20-6/11:
                20      Q.   Okay.  I am going to show you a copy of the
24              21  retainer agreement between yourself and Mr. Knight.
                22          And I just want you to -- and I will do this
25              23  with several documents just to get started -- to affirm
                24  that that is your signature.
26              25          (Counsel complies.)
                                        4

1    A.  (Witness complies.)
2        That is my signature.
3    Q.  Okay.  And the same on the settlement agreement?
4        (Counsel complies.)
5    A.  (Witness complies.)
6        That is my signature.
7    Q.  Okay.  And the same on the letter of -- dated
8  June 13, 2011?
9        (Counsel complies.)
10    A.  (Witness complies.)
11        That is my signature.
12    Q.  Okay.
13        MR. COHEN:  And could we make those the first
14  three exhibits in order.
15        And it doesn't really matter what order you want
16  to put them in.
17        (Plaintiff's Exhibit Numbers 1 through 3 were
18        marked for identification.)
19        THE REPORTER:  1, 2, and 3.
20  BY MR. COHEN:
21    Q.  And then finally, 4 will be --
22        I will ask you to do the same thing on the
23  stipulation for judgment.
24        (Counsel complies.)
25    A.  I am sorry, ask me for what?

5

1    Q.  I am asking you to affirm your signature on that
2  document as well.
3    A.  (Witness complies.)
4        Yes, that's my signature.
5    Q.  That is?
6    A.  (Witness nods head up and down.)
7    Q.  Okay.
8        MR. COHEN:  Would you mark that (indicating) as
9  the next in order.
10        (Plaintiff's Exhibit Number 4 was marked for
11        identification.)

      b.    7/17-23
17        THE WITNESS:  So your question was did we have
18  any agreement --
19        MR. COHEN:  Agreement.
20        THE WITNESS:  -- about the division of labor in
21  the Bill Knight case?
22        MR. COHEN:  Yes.
23        THE WITNESS:  No.

      c.    8/13-9/8:
13    Q.  Having worked with other attorneys on numerous
14  cases, I find that it breaks down all sorts of different
15  ways, depending on just the way things fall.
16        So sometimes I get called into a case, and I

19

17   wind up handling the whole case, with the other attorney
18   doing very little or nothing.  Sometimes we bat things
19   back and forth, and it winds up about 50/50.  And --
20   there is all sorts of different ways.  Sometimes I do all
21   the writing and they do all the appearing; sometimes it
22   is vice versa.
23          Was there anything along that -- those lines
24   that you could point to that indicated who did what on
25   Mr. Knight's case between you and Mr. Jordan?

8

1     A.  Um, I don't think so.
2          Um, we -- whoever was in the office, um, took
3   Bill's phone calls.  Um, we both made the court
4   appearances and appeared at the settlement conference.
5          Um, so I don't think that -- you know, we just
6   both did whatever work was -- I don't think there is any
7   real formal agreement or informal agreement.  Whatever
8   just came up was done.

     d.     13/16-14/10:
16    Q.   Okay.  So in March of 2007, when Exhibit 1 was
17   written, there were only the two of you in the office?
18    A.  I think so, yes.
19    Q.   And the general arrangement was referrals back
20   and forth or he -- basically he would refer cases to you?
21    A.  Yes.
22    Q.   But this was not one of them?
23          This was not -- in other words, was this a -- as
24   you described it before, it didn't sound to me like this
25   was a case in which you were paying him a -- the Knight

13

1   case was a case with which you were paying him a
2   12-percent referral; it sounded like you were basically
3   50/50, I think is what you said.
4     A.  Yeah, I would say that 98 percent of the work
5   that I and Mark have done is defense work, so it is
6   hourly fees.  We don't -- I typically didn't take
7   plaintiffs cases and Mark typically didn't take
8   plaintiffs cases.
9          So this was a little bit of an unusual
10   situation.

     e.     15/6-8:
6    Q.   Okay.  Did you have any writings reflecting your
7   arrangement with Mr. Jordan on the Knight case?
8    A.  No.

     f.     16/22-23:
22    A.  At some point, I would assume that Mark and I
23   decided to take the case together, yes.

     g.     17/5-11:

20

5    Q.   Okay.  Let me draw your attention to this
6  Exhibit 1 (indicating).
7    A.  (Witness complies.)
8    Q.   And it has been my understanding, looking at the
9  documents -- tell me whether I am right or wrong -- that
10  Mr. Jordan drafted that?
11    A.   That's correct.

    h.      18/12-21:
12       Did you ever communicate with Mr. Jordan about
13  how the fee would be distributed in an installment
14  recovery?
15    A.   No.
16    Q.   So is it fair to say that the first time that
17  the issue came up about how the fee -- in terms of your
18  communicating with anybody, in terms of how the fee would
19  be distributed in an installment payment, would be when
20  Mr. Knight raised the issue with you?
21    A.   I think so.

    i.      22/15-22:
15       You have -- you don't remember one way or the
16  other whether the idea that the attorneys got paid first
17  was discussed at that time that you discussed the
18  installment nature of the offer?
19    A.   Um, I don't remember, but I -- I would assume
20  that it was, because it is an installment --
21    Q.   And --
22    A.   -- payment.

    j.      25/4-6:
4       THE WITNESS:  I believe that there was only one
5  other contingency-fee case that I worked on with Mark,
6  and that was just, you know, no installment.

    k.      25/8-26/20:
8    Q.   In your practice, other than working with Mark,
9  did you have any plaintiffs cases that resulted in
10  installment settlements or awards?
11    A.   From -- I am sorry, from what period of time?
12    Q.   In any -- in any of the rest of your practice,
13  the entire rest of your practice.
14    A.   When I -- I had initially started working for a
15  personal-injury firm and --
16    Q.   Approximately what date?
17    A.   January of 2001, I think.
18    Q.   Do you remember the name of the firm?

19    A.   "Law Offices of Julia Parranto."
20       P-A-R-R-A-N-T-O.
21    Q.   Two Rs?
22    A.   Yes.

21

23     Q.  And you worked for them for about a year?
24     A.  It may have been a little bit --
25         Either one year or two years.

25

1         It may have been two years.
2     Q.  And I know you were in the middle of the answer,
3  but I am going to break it down, hopefully make it
4  cleaner.
5         During that time, did you have cases of your own
6  when you were working with Miss Parranto's firm?
7     A.  No.
8     Q.  Okay.  You had -- in that firm, there were cases
9  that settled on an -- or finished on an
10  installment-payment basis?
11     A.  I actually don't remember.
12     Q.  Either way?
13     A.  That's correct.
14     Q.  Okay.  So is it --
15         What I -- I want to make sure I am correct on
16  this.
17         Is it correct to say that this case with
18  Mr. Knight is the only case involving an installment
19  payment that you've ever worked, that you can remember?
20     A.  That I can remember as we sit here today, yes.

     l.     28/10-30/12:
10         I believe that I did research during -- after --
11  you know, in the spring of 2007, about additional
12  defendants that we could name, um, because I also believe
13  I had done an asset search on Doubleshot to determine
14  what assets they had, in addition to what assets
15  Alan Shulman, the principal of Doubleshot, um, owned.
16     Q.  Are the results of that in the file?
17     A.  If they were printed out from Lexis, they
18  prob- -- I am sure they are.
19     Q.  Okay.  Do you recall --
20         I mean we'll look afterwards, find out the
21  details.
22         But as you sit here now, do you recall anything
23  about the results of that search?
24     A.  Huh, Alan Shulman had pretty much no assets.  He
25  owned a piece of real property, but I believe that it was

28

1  upside-down (indicating).
2     Q.  You mean a piece of real property?
3     A.  Yes.
4     Q.  Uh-huh.  Okay.
5     A.  And then we -- I had also done research, um,
6  about another individual who we thought we might be able
7  to name as a defendant.  Um, I believe his name was
8  "Stuart Kesten."
9     Q.  Okay.

22

10      A.   And he is -- he is the President of
11   Bank of California in San Francisco.
12           And Bill had told us that -- um, that they were
13   allowed -- that Doubleshot was allowed to use his credit
14   cards and he would pay, you know, off the credit cards.
15           So we -- Mark and I were hoping, and we were
16   researching, that we could possibly name him as a
17   defendant under some type of, you know, joint employer or
18   alter ego theory.
19      Q.   What was the upshot of that research?
20      A.   Huh, it would not work.
21      Q.   Do you remember anything about the reason why
22   not?
23      A.   No, I can't remember.
24           But I do believe that --
25           And I actually think his name was

29

1   "Stuart Kesten."
2           I -- I believe he did participate in the
3   mediation that we had with Judge Gallagher in December of
4   2007.
5      Q.   And do you remember what --
6           Let me guess.
7           Was he saying basically, "You know, I have
8   nothing to do with this. Let8 me out of this"?
9      A.   Huh, probably.
10           And -- and he wasn't a Board member or a
11   shareholder, where, you know, if he was, we would have
12   had a -- you know, a better argument to bring him in.

        m.      32/2-14:
2           There was nothing in your -- the way of your
3   communicating with Bill?
4           In other words, you did not -- you can --
5           I am going to use the phrase again, "division of
6   labor."
7           You didn't have an arrangement or agreement with
8   Mark whereby only he or mostly he would communicate with
9   Bill?
10      A.   No.
11      Q.   If you had something to call Bill about, you
12   would talk to him or if Bill wanted to talk to you, no --
13   no big deal?
14      A.   That's correct.

        n.      35/15-36/12:
15      Q.   Okay.  And did you ever talk to Bill about this
16   subject again between that date and then the June 9 -- I

17   think it is the 19th of 2011, when you wrote another
18   letter, which I will --
19           Has it already been marked?

23

20   A.  I -- I probably spoke to Bill about it when I
21   was drafting the settlement agreement and -- for his
22   signature and also when I was drafting the stipulation
23   for his signature, and I also may have probably spoke to
24   him about it when the first settlement check came in, and
25   I had to ask him for a power of attorney so I could

35

1   deposit it into my trust account.
2        So I probably had discussions with him about it
3   at those times.
4   Q.  So the settlement agreement --
5        MR. COHEN:  Why don't we get it read back.
6        Or unless you can remember.
7   Q.  The settlement agreement?
8   A.  The settlement agreement, when I was drafting
9   it, when I was drafting the stipulated judgment, and also
10   when the first settlement check came in, and I needed to
11   have Bill sign a power -- a limited power of attorney for
12   me so I could deposit it into my trust account.

o.      38/8-39/6:

8   Q.  When you first discussed with Bill that you --
9   the attorneys get paid first out of an installment
10   settlement, do you recall what your basis for saying that
11   at the time was?
12   A.  Huh, yes.
13       The settlement agreements that is -- I am
14   sorry -- the retainer agreements that I use for
15   contingency fee cases came from when I worked for the
16   personal-injury law firm; those are the retainer
17   agreements that we used there.
18       And in those retainer agreements, it
19   specifically says about installment payments and
20   structured settlements, that the attorney fees are to be
21   paid upfront.
22       And during -- while -- during the course of my
23   employment with that personal-injury firm, I also had
24   occasion to look at other personal-injury-firm retainer
25   agreements, and they all pretty much say that.

38

1   Q.  Did that -- were --
2        Any of those contingency retainer agreements you
3   looked at make any distinction between installment
4   payments in a structured settlement versus installment
5   payments not in a structured settlement?
6   A.  I don't remember.

p.      39/25-40/3:

25       There is nothing in the retainer agreement,

39

1   which is Exhibit 1, which references attorneys getting

24

Declaration of Michael Cohen in Support of Partial Summary Judgment

1
2  paid first out of any installment payment, is there?
3      A.  No.

2

3      q.     47/9-17:
   9       When did you first become aware of the Dalzell
   10  case?
4  11      A.  I don't know.
   12      Q.  Okay.  Do you know whether you were aware of it
5  13  at the time in September of 2010?
   14      A.  I don't think so.
6  15          Probably not.
   16          I probably first became aware of it in -- after
7  17  this lawsuit was filed.

8      r.     48/5-8:
   5       This -- the settlement agreement says that all
9  6  checks go to you.
   7       You understand that, right?
10  8      A.  Yes.

11     s.     54/17-22:
   17      But I think what is in the settlement agreement
12  18  is only that the checks are written to Bill and they go
   19  to you; is that correct?
13  20      A.  Yes.
   21      Q.  And the same is true of the stipulated judgment?
14  22      A.  Yes.

15     t.     78/20-80/18:
   20      THE REPORTER:
16  21          "Question:  Did you have any discussions
   22          or communications with anybody regarding
17  23          whether to include Shulman on the judgment
   24          and settlement?"
18  25      THE WITNESS:  Well, we didn't name him in the
                                78
19  1  Complaint, because you're not personally liable for a
   2  wage claim.
20  3       I don't know whether -- I don't know whether we
   4  had discussions, but it was certainly thought about,
21  5  but -- from my research as to Alan Shulman's assets,
   6  there wasn't any point to it.
22  7       And we -- I -- we did request security from
   8  Doubleshot, and specifically I wanted security from Alan
23  9  even if -- using his real -- I wanted a deed of trust
   10  using his real property, even though it was upside-down,
24  11  and I believe I also wanted security from Doubleshot,
   12  whatever their AR and their -- you know, patents and --
25  13      MR. COHEN:  Uh-hum.
   14      THE WITNESS:  But it was all refused at the
26
   15  settlement conference.
                                25

16    We also may have discussed security at
17 mediation, which was refused also.
18 BY MR. COHEN:
19    Q.  Earlier you mean?
20    A.  Yes.
21    And when -- when there is installment payments
22 and -- I typically do negotiate security.
23    Q.  From the defense side do you mean?
24    A.  Yes.
25    When --

79

1    Yes.
2    Well, it -- I wouldn't be on the defense side.
3    If I am representing an employer in -- in a
4 particular case and people owe us money and it is going
5 to be payments --
6    Q.  Oh, I see.
7    A.  -- I always typically negotiate some type of
8 security.
9    Q.  These are in business disputes?
10   A.  Yes.
11   Q.  Not with employees.
12   I mean you are not going to get an installment
13 judgment --
14   A.  Oh, no.  No.
15   These are different type of cases.
16   Q.  Okay.  And in those cases, you are getting paid
17 by the hour in any case?
18   A.  Yes.

I declare under penalty of perjury, under the laws of the United States of America, that the

foregoing is true and correct.

DATED: July 26, 2013

_____

MICHAEL COHEN

_____

Declaration of Michael Cohen in Support of Partial Summary Judgment