**Exhibit A**

1                UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                 (OAKLAND DIVISION)

4

5 WILLIAM E. KNIGHT,

6               Plaintiff,

7 vs.                    Case No. CV 11 6337-YGR

8 DIANE AQUI, MARK D. JORDAN,
Deceased, ESTATE OF MARK D.

9 JORDAN, and DOES 1-100,         **CERTIFIED**
                               **COPY**

10              Defendants.

11 _____/

12            **DEPOSITION OF DIANE AQUI**

13

14 DATE:         Thursday, December 6, 2012

15 TIME:         11:17 a.m. through 1:45 p.m.

16 PLACE:        Law Offices of Bruce E. Krell
                345 Grove Street, First Floor

17                 San Francisco, California

18

PURSUANT TO:  Notice

19

REPORTED BY:  DAWN SUE STEFKO,

20                 CSR No. 5079

21 _____

22

23           **STEFKO REPORTING**
       **CERTIFIED SHORTHAND REPORTERS**

24             **2012 Easton Drive**
        **Burlingame, California  94010**

25              **(650) 685-1795**
           **dawnstefko@aol.com**

                                            1

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1    **APPEARANCES:**

2    For the Plaintiff          LAW OFFICES OF BRUCE E. KRELL
     William E. Knight:         BY:  MICHAEL COHEN,
3                                     ATTORNEY AT LAW
                                345 Grove Street
4                               First Floor
                                San Francisco, California 94102
5                               (415) 861-4414

6    For the Defendants:        RoecaHaasHagerLLP
                                BY:  EDWARD D. HAAS,
7                                     ATTORNEY AT LAW
                                351 California Street
8                               Suite 900
                                San Francisco, California 94104
9                               (415) 352-0980

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                         2

DEPOSITION OF DIANE AQUI – DECEMBER 6, 2012

**INDEX OF EXAMINATIONS**

PAGE

Examination by Mr. Cohen                                4

**INDEX OF EXHIBITS**

PLAINTIFF'S                                           PAGE

Number 1      Jordan & Aqui letter dated 3-29-07,       5
              2 pages

Number 2      Document entitled "Settlement             5
              Agreement" dated 4-30-09, 7 pages

Number 3      Aqui letter dated 6-13-11, 2 pages        5

Number 4      Document entitled "Stipulation For        6
              Entry Of Judgment" dated 4-28-09,
              5 pages

Number 5      Handwritten notes, 4 pages               43

Number 6      Document entitled "Limited Power of      65
              Attorney" dated 6-30-09, 1 page

DEFENDANTS'                                           PAGE

                        (none marked)

                                                        3

STEFKO REPORTING   (650) 685-1795

```
 1                        --oOo--

 2                      DIANE AQUI,

 3            having been first duly affirmed by

 4             the Certified Shorthand Reporter

 5             to tell the truth, the whole truth

 6             and nothing but the truth testified

 7                    as follows:

 8            EXAMINATION BY MR. COHEN:

 9       Q.   Please state your name for the record.

10       A.   Diane Aqui.

11            A-Q-U-I.

12       Q.   Miss Aqui, I assume that you have participated

13   in numerous depositions, and I don't need to put the

14   standard admonitions on the record.

15            Do you agree with that?

16       A.   Yes.

17       Q.   Okay.  Great.

18            And you are an attorney?

19       A.   Yes.

20       Q.   Okay.  I am going to show you a copy of the

21   retainer agreement between yourself and Mr. Knight.

22            And I just want you to -- and I will do this

23   with several documents just to get started -- to affirm

24   that that is your signature.

25            (Counsel complies.)
```

                                                    4

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1              And we each, um, paid a particular percentage of

2      the expenses of the office based on the square footage of

3      our individual offices.

4          Q.   And how long did that arrangement last?

5          A.   That arrangement lasted probably for about maybe

6      three or four years, when the two other attorneys in the

7      office left, and another attorney came in, and she and I

8      then formed our own partnership, and I would say that

9      that was about in, um, 2005.

10             Our -- our partnership dissolved, and I -- and I

11     believe that the financial arrangement that I had with

12     Mark --

13         Q.   During that partnership with the other attorney?

14         A.   It --

15         Q.   I am just trying to figure out the time.

16         A.   I am --

17             Well, after our partnership dissolved.

18         Q.   Okay.

19         A.   And -- and she left the office.

20         Q.   Leaving only you and Mark?

21         A.   Yes.

22         Q.   Okay.

23         A.   Um --

24         Q.   And this was about 2007 something?

25         A.   Um, 2005, 2006.

                                                              12

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1    Q.   Okay.

2    A.   The arrangement with Mark changed, and I was

3    paying less office expenses and more of a referral fee to

4    him.

5         And I don't remember exactly what the

6    percentages were.

7         In -- sometime in 2009, I actually left

8    completely, and then came back in -- I believe it was

9    July of 2009, and same arrangement about the expenses

10   and -- um, I believe the expenses may have been split in

11   half, and, um, paid Mark a referral fee on his clients.

12        And since our association, I have always paid my

13   own phone and my own legal research and my own

14   malpractice insurance.

15        And I think that about covers it.

16   Q.   Okay.  So in March of 2007, when Exhibit 1 was

17   written, there were only the two of you in the office?

18   A.   I think so, yes.

19   Q.   And the general arrangement was referrals back

20   and forth or he -- basically he would refer cases to you?

21   A.   Yes.

22   Q.   But this was not one of them?

23        This was not -- in other words, was this a -- as

24   you described it before, it didn't sound to me like this

25   was a case in which you were paying him a -- the Knight

13

DEPOSITION OF DIANE AQUI – DECEMBER 6, 2012

1    logically one can ask to draw that conclusion, but before

2    that point, whenever that was, you can't really remember

3    how it developed?

4         A.    No, I can't.

5         Q.    Okay.  Let me draw your attention to this

6    Exhibit 1 (indicating).

7         A.    (Witness complies.)

8         Q.    And it has been my understanding, looking at the

9    documents -- tell me whether I am right or wrong -- that

10   Mr. Jordan drafted that?

11        A.    That's correct.

12        Q.    Did you have any hand --

13              Did you communicate with Mr. Jordan in the

14   drafting of that?

15        A.    No.

16        Q.    Did you communicate with Mr. Knight in

17   connection with that document?

18              In other words, at the time that it was being

19   negotiated, when it --

20        A.    No, I didn't.

21        Q.    Okay.  Do you recall the first time you

22   communicated with Mr. Knight on the subject of that

23   document or its contents?

24        A.    Probably if I -- this is my -- if I remember

25   correctly, the first time that this -- that I

                                                              17

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1    deposit it into my trust account.

2          So I probably had discussions with him about it

3    at those times.

4    Q.    So the settlement agreement --

5          MR. COHEN:  Why don't we get it read back.

6          Or unless you can remember.

7    Q.    The settlement agreement?

8    A.    The settlement agreement, when I was drafting

9    it, when I was drafting the stipulated judgment, and also

10   when the first settlement check came in, and I needed to

11   have Bill sign a power -- a limited power of attorney for

12   me so I could deposit it into my trust account.

13         Oh, and I also had -- it -- necessarily I had

14   discussions with him about it when, um, Bill had asked

15   that all the checks for the entire period of the

16   settlement be written to -- um, be written to my trust

17   account, so, you know, all the money would come through

18   my trust account, and I would turn around and give the --

19   you know, write Bill checks.

20   Q.    Did --

21   A.    And -- so we had a discussion about it then.

22   Q.    Do you remember anything about the contents of

23   that discussion, the particular one you just referred to?

24   A.    When we -- when I was in the process of drafting

25   the settlement agreement, Bill had wanted all the checks

36

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1    written to both him and my trust account and sent to my

2    office.

3            Um, if you look in the settlement agreement, you

4    will see the mailing addresses of where the checks are to

5    go and also how the checks are to be written out.

6            And Bill wanted them all to -- as I said, all to

7    come to my office and be written out to both me and him,

8    and he thought that it would give Doubleshot more

9    incentive to pay if -- if they knew that we would -- you

10   know, we would be involved throughout the period of the

11   settlement.

12           And I had told him that I did not want to do

13   that, as I didn't want to be put in the position of

14   running his money through my trust account and then

15   having to give him a 1099 every year and account for it

16   on my taxes.

17       Q.   But you agreed to it nevertheless, to run the

18   money through your trust account?

19       A.   Only those checks that were for our attorney

20   fees.

21       Q.   Were there any checks that came that you did not

22   run through your trust account?

23       A.   Um, there was a --

24           I am not sure.

25       Q.   Were you just thinking of the $5,000 penalty

37

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

```
1    discussion regarding her forwarding the check --
2    regarding you forwarding the checks directly to him is
3    probably a logical construct from looking at the past
4    events rather than actual memory?
5         A.   That's correct.
6         Q.   Okay.
7         A.   I do know that I did -- that I did have a
8    discussion with him that I was not going to be depositing
9    this money in my trust account.
10             But -- you know, the checks written out to him
11   alone.
12        Q.   Do you remember anything about that discussion
13   at all?
14        A.   Yes.
15             I said to him, "It -- I do not want to put this
16   in my trust account.  I do not want my name on these
17   checks and if -- if I do, I am going to have to claim it
18   on income -- as income on my taxes and I am going to have
19   to write you a 1099.  And I do not want to be involved
20   with that every year."
21        Q.   He -- I mean I am going to ask the same question
22   again --
23        A.   Sure.
24        Q.   -- because the way you phrased it is --
25        A.   Uh-hum.
```

52

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1     Q.   The way you phrased it was you had the

2 discussion in which you expressed your preference.  That

3 was -- that is actually the grammar of your --

4          We can read it back.  At least that is how I

5 heard it.

6          Right now the question is:  Do you remember

7 saying "I am not going to do that" --

8     A.   Yes.

9     Q.   -- "period"?

10    A.   Yes.

11    Q.   Okay.  Do you remember --

12         Was -- this is on the phone?

13    A.   Yes.

14    Q.   Do you remember what he said?

15    A.   I assume that he ultimately agreed with me,

16 since that was the language that was put in the

17 settlement agreement and the stipulated judgment.

18         Because we had this discussion while I was

19 drafting these documents.

20    Q.   And what language are you specifically referring

21 to?

22    A.   That these checks -- that the checks after a

23 certain date are going to be written only to him alone

24 (indicating).

25    Q.   Oh.  Yeah.  Okay.

                                                      53

1       I am going to -- I am going -- I am -- I am

2   going to be doing lawyer-parsing-words stuff here.

3       The subject is not that -- how the checks would

4   be written, but when you received them, what would happen

5   to them.

6       Would they go into the trust account, would you

7   send them on to Bill, would you tell --

8       So the question is:  The discussion with Bill in

9   which you said "I am not going to put these in my trust

10  account"?

11      A.   (Witness nods head up and down.)

12      Q.   Okay.  We got that clear.

13      A.   Uh-hum.

14      Q.   Then the next question is:  I think as part of

15  your answer, you said it is in the trust -- you said it

16  is in the settlement agreement.

17      But I think what is in the settlement agreement

18  is only that the checks are written to Bill and they go

19  to you; is that correct?

20      A.   Yes.

21      Q.   And the same is true of the stipulated judgment?

22      A.   Yes.

23      Q.   Okay.  So then the next question is:  In your

24  conversation with Bill, when you said you are not going

25  to put it in your trust account, do you remember his

54

1    response?

2         A.    I assume he ultimately agreed with me.

3         Q.    Okay.

4         A.    Yeah.

5         Q.    But you can't remember?

6         A.    No.

7         Q.    Okay.  Do you remember anything then further

8    along this parsed line that I am questioning here?

9              In that conversation, do you remember further

10   saying "Not only am I not going to put them in the trust

11   account but I am going to tell the opposing attorney at a

12   certain point to send them directly to you"?

13             MR. HAAS:  You are asking about her conversation

14   with him?

15             MR. COHEN:  With Bill.

16             THE WITNESS:  I don't --

17             MR. COHEN:  Exactly right.

18             THE WITNESS:  I don't remember that.

19             MR. COHEN:  Okay.

20             MR. HAAS:  We have been going about an hour and

21   a half.

22             Would this be a time to take a short break?

23             MR. COHEN:  It is totally up to you guys.

24             THE WITNESS:  I am fine.

25             Unless the Reporter is fine, unless you are

                                                          55

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

```
 1              (Discussion off the record.)
 2    BY MR. COHEN:
 3        Q.   I may have asked this, but I will -- and if
 4    you -- if I have, tell me.
 5              And if it is not too much trouble, answer it
 6    again.
 7              Then the September 1, 2010 E-mail from
 8    Mr. Knight asserting his opinion that the attorney
 9    payment first in installment awards is incorrect, you
10    discussed that with Mr. Jordan as soon as it came in,
11    correct?
12        A.   No.
13        Q.   Is that because Mr. Jordan was --
14             When -- when did he die again?
15             December of 2010?
16        A.   Yes.
17        Q.   Okay.  Is that because he was ill?
18        A.   Yes.
19        Q.   Okay.  Did you discuss it with him at all?
20        A.   I don't remember.
21        Q.   Okay.
22        A.   I believe yes, I did, but just maybe once,
23    because he was in the hospital, and I didn't want to
24    upset him.
25        Q.   When did he go into the hospital?
```

75

DEPOSITION OF DIANE AQUI - DECEMBER 6, 2012

1          MR. HAAS:  -- about those as well?

2          MR. COHEN:  No.

3          Just 15.1 has a general response.

4          THE WITNESS:  Well, he acquiesced to the

5     disbursement of the settlement funds by signing the

6     settlement agreement and the stipulated judgment.

7          MR. COHEN:  Okay.

8          Q.   And the same would have to do with the facts

9     supporting the allegation of waiver?

10         A.   Yes.

11         Q.   Okay.  And estoppel?

12         A.   Yes.

13         Q.   Okay.  And negligence, to use reasonable care to

14    protect himself; namely, the acquiescence?

15         A.   Yes.

16         And my reliance in -- in my judgmental reliance

17    in relying on him agreeing to all of this.

18         I would not have disbursed any of those funds in

19    that way if I had known that he was questioning it.

20         Q.   And the acquiescence -- the facts -- the fact

21    nexus around the concept of acquiescence, which, you

22    know, we don't have to go into the details here, that

23    would also support the allegation of assumption of the

24    risk?

25         A.   Perhaps.

                                                          92



**JORDAN & AQUI**
*An Association of Individual Attorneys*
1612 Fourth Street
Santa Rosa, CA 95404-4020
Telephone: (707) 526-3700
Facsimile: (707) 526-1716

Mark D. Jordan
Diane Aqui

mdj@1612fourth.com
da@1612fourth.com

March 29, 2007

**PERSONAL & CONFIDENTIAL**

Mr. William E. Knight
Executive Director
Knight Vision Group
2 Oyster Shell Lane
Hilton Head, SC 29926

**Via Facsimile & U.S. Mail**
(843) 681-1975

Re:   <u>Wage Claim, Stock sale vs. Doubleshot, Inc.</u>

Dear Bill:

We enjoyed meeting with you and your wife in our office and we must confess you are about "as organized" as any claimant with a wage claim that our office has represented.

This will confirm our strategy and Fee Agreement regarding this matter:

♦   Mark D. Jordan, Esq., Diane Aqui, Esq. will represent your interest in pursing the above-referenced claims. Mr. Jordan's hourly rate is $350.00 per hour and Ms. Aqui's is $275.00. We will track all of our time inasmuch as one of the damages we will be seeking are attorney fees. Your invoice from us is on a contingency fee basis, as outlined below.

  The total amount realized by way of settlement and/or litigation will be referred to as total settlement. Said sum will most probably include wages due; penalties; interest; purchase or redemption of stocks; and attorney fees. From the total sum, Jordan and Aqui will be reimbursed for all out-of-pocket costs incurred, including, but not limited to, filing fees, depositions, process service, expert witness fees, and private investigators utilized (not anticipated at this juncture). The remaining sum will be split as outlined in Phase I, II, III.

♦   <u>Phase I</u> - Jordan and Aqui will prepare a thorough demand letter, including any and all causes of actions which exist; law and facts to support the claim; and documentary evidence, including, but not limited to, time cards, pay stubs, and e-mails. Said letter shall be addressed to Doubleshot, Inc., as well as Stewart Keirle, explaining our theory that he is an alter-ego of the Corporation and that we are confident we can easily pierce the corporate veil. Said letter will be prepared in no longer than two weeks from this date, but will not be sent out until the Labor Commissioner has sent out a Notice of Hearing, and the letter has been authorized by you for sending.

  If the matter is resolved prior to a complaint being filed in Superior Court of Sonoma County, the contingency fee payable to Jordan and Aqui will be twenty-five percent (25%).

♦   <u>Phase II</u> - should it become apparent that the matter is not going to be resolved and a complaint needs to be filed in Superior Court, Jordan and Aqui will seek authorization from you to file said lawsuit at which time the contingency fee arrangement will move up to thirty-three and one-third percent (33-1/3%).

Mr. William Knight
March 29, 2007
Page 2

   ♦   <u>Phase III</u> - As the matter proceeds through litigation, upon being advised by the Court that there is a trial date set, the contingency fee will be moved to forty percent (40%).

It is our belief that this accurately reflects the agreement made with Mark Jordan and you by telephone.  If this is accurate, kindly execute below and return to us by facsimile.

We have enclosed two documents which Mark believes you asked for "one or the other," he was not sure!

Lastly enclosed, for your reading pleasure, is preliminary research about whether or not you are an exempt employee.  While we indicated that it was a "factual question," It is my belief that since you do not supervise anyone; your employment contract requires you to check with "your supervisors;" and perhaps more importantly, that you are not salaried, but rather hourly, that despite the high level of competence needed to do your job and the high hourly rate, that you will be found to be "non-exempt" and be entitled to time and one-half (1-1/2) your hourly rate for all hours worked in excess of eight (8) in one day, or forty (40) hours in a week.  On those days that you worked in excess of twelve (12) hours on a seventh (7th) consecutive day, your rate will be double time.  You may wish to read those enclosures when your mail arrives, inasmuch as we have highlighted the pertinent sections.

Your confidence in our firm remains appreciated.

Very truly yours,

JORDAN & AQUI

Mark D. Jordan

MDJ/mc
Enclosures

Diane Aqui

---

Fee Agreement outlined above is acceptable.

Dated: _30 May 2007_

WILLIAM E. KNIGHT

Exhibit "A"

Apr 30 09 11:12a    Q                                         1                              p.6


PLAINTIFF'S
EXHIBIT
#2
Aqui

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (hereinafter referred to as "Agreement") is made as
of April 10 , 2009, by and between Defendant DOUBLESHOT, INC, a California Corporation
(hereinafter referred to as "Defendant"), and plaintiff WILLIAM E. KNIGHT ( hereinafter
referred to as "Plaintiff"). Defendant and Plaintiff may also be hereinafter collectively referred to
as "the parties".

A. Plaintiff has filed a Complaint ("Complaint") against Defendant, in the Superior
Court of the State of California, in and for the County of Sonoma, entitled WILLIAM E.
KNIGHT vs. DOUBLESHOT INC., and DOES 1 to 50, inclusive,  Case No. SCV 241748.
Plaintiff's Complaint will be hereinafter collectively referred to as the "Action."

B. The parties hereto desire to settle and terminate the Action as against Defendant
DOUBLESHOT, INC. hereunder and forever discharge all claims, demands, liabilities, and
causes of action against one another based upon or arising out of the subject matter of the Action
referred to in paragraph A herein above.

NOW, THEREFORE, for good and valuable consideration, including the mutual
covenants herein contained, it is agreed as follows:

### AGREEMENT

1. **Settlement of the Action.** For and in consideration of settlement between the
parties, Defendant hereby agrees to make payment to Plaintiff WILLIAM E. KNIGHT in the
amount of five hundred and fifty thousand dollars ($550,000.00).  In exchange, Plaintiff gives
up any and all rights to any stock options in Doubleshot, Inc. that may have been granted to
him by virtue of his employment with Defendant. This settlement shall be made as follows: One
payment of one hundred and fifty thousand dollars  ($150,000.00) paid on or before July 31,
2009; and twelve equal payments of thirty three thousand three hundred thirty three dollars and
thirty three cents ($33,333.33) every quarter  for thirty six (36) months thereafter, due on the
last day of each quarter, pursuant to the following schedule, and payable in the following
manner:

July 31, 2009        $150,000.00    William E. Knight and Trust Account of Attorney Diane Aqui
October 31, 2009     $ 33,333.33    William E. Knight and Trust Account of Attorney Diane Aqui
January 31, 2010     $ 33,333.33    William E. Knight and Trust Account of Attorney Diane Aqui
April 30, 2010$ 33,333.33    William E. Knight and Trust Account of Attorney Diane Aqui
July 31, 2010        $ 33,333.33    William E. Knight and Trust Account of Attorney Diane Aqui

Page 1 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                                        April 17, 2009

| | | |
|---|---|---|
| October 31, 2010 | $ 33,333.33 | William E. Knight |
| January 31, 2011 | $ 33,333.33 | William E. Knight |
| April 30, 2011 | $ 33,333.33 | William E. Knight |
| July 31, 2011 | $ 33,333.33 | William E. Knight |
| October 31, 2011 | $ 33,333.33 | William E. Knight |
| January 31, 2012 | $ 33,333.33 | William E. Knight |
| April 30, 2012 | $ 33,333.33 | William E. Knight |
| July 31, 2012 | $ 33,333.33 | William E. Knight |

All checks shall be mailed to Attorney Diane Aqui, 1612 Fourth Street, Santa Rosa, CA 95404.

Plaintiff agrees to provide written notice to defendant Doubleshot, Inc. and attorney Steven Kesten of any address changes.

As part of the settlement described above, Defendant hereby agrees to execute the attached stipulation for entry of judgment in the amount of seven hundred thousand dollars ($700,000.00), which shall be held, but not filed by Plaintiff's counsel. If Defendant fails to make any of the above payments, after a written thirty (30) day notice period to Defendant Doubleshot, Inc. and attorney Steven Kesten, Defendant hereby agrees that Plaintiff's counsel shall file the attached stipulation for entry of judgment.

William Knight hereby releases and forever discharges Doubleshot, Inc., and its officers, directors, agents, representatives, employees, and heirs, from any and all claims, demands, assertions of liability, causes of action, obligations, damages, claims for indemnity of any kind, nature or character whatsoever (except for the obligations set forth within this Agreement) he has against Doubleshot., Inc. arising directly or indirectly out of the facts and circumstances of the Action - Sonoma County Superior Court Case No. 241748;

All parties hereby, on behalf of themselves and the entities on whose behalf they have signed, represent and warrant that the undersigned have the authority and the capacity to make this Agreement and to carry out the terms hereof.

2.   **Indemnification/Hold Harmless re Liens, Claims, Actions, Etc.**  As a further consideration for the payment stated herein, plaintiff agrees to indemnify defendant and to hold them harmless of and from any claims, actions, causes of actions or liens brought by any person or entity arising out of or in any way connected with the matter alleged in the action, including, but not limited to, any claims, liens, lawsuits, or actions for payment of unemployment liens, or other damages, costs or expenses allegedly incurred by plaintiff.

3.   **Waiver of Rights.**  This Agreement shall be construed under the laws of the State of

Page 2 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                                        April 17, 2009

California. It is the intention of the parties hereto that the release contained herein shall be effective as a full and final accord and satisfaction, as a bar to all actions, causes of action, obligations, costs, expenses, attorneys' fees, damages, losses, claims, liabilities, and demands of any nature, character, or kind, known or unknown, suspected or unsuspected, arising out of, directly or indirectly, the subject matter of the Action.

4. **Shares Owned by Plaintiff.** This settlement agreement and the waiver described in paragraph 3, specifically does not apply to the ownership of any shares of DOUBLESHOT, INC. by plaintiff.

5. **Dismissal of Action.** Immediately upon execution of this Agreement by all parties hereto, Plaintiff shall authorize, direct, and cause his attorney to file a Request for Dismissal, with prejudice, with the court stating that the court retains jurisdiction over the case, the parties hereto and the dispute so as to enforce the terms of this settlement under CCP § 664.6. The court is empowered to receive into its files the Stipulation for Judgment and Judgment, should Defendant default on the terms and provisions of this agreement. Immediately upon receipt of a Request for Dismissal stamped by the court as received and filed, Plaintiff's counsel shall provide to Defendant's attorney an endorsed-filed copy of such dismissal with prejudice.

6. **No Admissions of Liability.** All parties represent and acknowledge that they have entered into this Agreement solely for the purpose of preventing further involvement in protracted and costly litigation based upon the disputed claims in the Action and issues surrounding settlement of the Action. Neither the settlement of the Action nor the settlement of issues pertaining to the Action, nor anything contained herein, shall be construed to be at any time or any place an admission on the part of any party hereto of any of the claims in the Action or referred to herein.

7. **Older Workers' Benefit Protection Act and Age Discrimination in Employment Act of 1967.** Knight specifically understands and acknowledges that the Age Discrimination in Employment Act of 1967, as amended, provides Knight the right to bring a claim against the released parties if Knight believes that he has been discriminated against by Defendant on the basis of age . Knight understands the rights afforded under this Act and agrees that he shall not file any claim or action against any released parties based on any alleged violation(s) of the Age Discrimination in Employment Act, up through the date this Agreement is executed by Knight. Knight hereby waives any right to assert a claim for relief available under the Age Discrimination in Employment Act, including, but not limited to, back pay, attorneys' fees, damages, lost benefits, reinstatement or injunctive relief for any act or omission by the released parties up through the date of Knight's execution of this Agreement.

This Agreement was delivered to Knight on April 3O , 2009. Knight understands and agrees that he may have a period of **twenty-one (21) calendar days** to consider this Agreement. Knight further acknowledges, understands and agrees that if he executes this Agreement prior to the expiration of

Page 3 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                                        April 17, 2009

the **twenty-one (21) day period**, the decision to do so is his and his alone, and that as a result, he has voluntarily, knowingly, and willingly waived the twenty-one (21) day period. Knight further acknowledges, understands and agrees that this Agreement shall not become effective or enforceable until **seven (7) calendar days** after it is executed by him (the "Effective Date") and that during that **seven (7) calendar day period**, Knight may revoke this Agreement. Knight further understands and agrees that any such revocation of this Agreement by him shall render this Agreement wholly null and void.

8. **Persons/Entities Bound By Agreement.** This Agreement shall be binding upon and for the benefit of the parties hereto and their respective successors, subsidiaries, divisions, affiliates, representatives, assigns, officers, directors, employees and beneficiaries, wherever the context requires or admits.

9. **Advice of Counsel.** The parties hereto expressly state that they have consulted with their respective attorneys of record concerning this Agreement, and have been fully advised by such attorneys with respect to their rights and obligations hereunder.

10. **No Oral Modification Of This Agreement.** This Agreement constitutes the entire Agreement between the parties, and it is expressly understood and agreed that this Agreement may not be altered, amended, modified, or otherwise changed in any respect or particular whatsoever, except by a writing duly executed by authorized representatives of all of the parties hereto, and that no extrinsic evidence whatsoever may be introduced in any judicial or arbitration proceeding.

11. **No Claim of Oral Modification Of Agreement.** The parties hereto acknowledge and agree that they will make no claim at any time or place that this Agreement has been orally altered or modified in any respect whatsoever, and that they will not hereafter claim that this Agreement has been altered, modified, or otherwise changed by oral communication of any kind or character whatsoever.

12. **Each Party Responsible for Their Own Costs.** Each party to this Agreement shall be responsible for the payment of its own costs, attorney's fees and all other expenses it has incurred in or arising in any way out of the Action, with the exception of those costs set forth in paragraph 1.

13. **Attorneys' Fees For Prevailing Party In Action To Enforce/Interpret Agreement.** If any legal action, arbitration, or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties will be entitled to recover reasonable attorney's fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. This paragraph includes fees and costs required for enforcing any judgment.

Page 4 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                          April 17, 2009

Apr 30 09 11:14a      Q                              1                    p.10

14. **Venue For Enforcement Action.** If any legal action is brought for the enforcement of this Agreement, IT IS STIPULATED AND AGREED by the parties hereto that the venue for any such action shall be in Sonoma County, California.

15. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original and shall be deemed duly executed upon the signing of the counterparts by the parties hereto. The parties agree that facsimile signatures hereto shall have the same force and effect as original signatures.


**PLAINTIFF**

Dated: _____, 20__          By: _____
                                      WILLIAM E. KNIGHT, Plaintiff

**DEFENDANT**

Dated: _____, 20__          By: _____
                                      ALAN SCHULMAN,
                                      PRESIDENT, DOUBLESHOT, INC., defendant

See next page b/b

APPROVED AS TO FORM:                  JORDAN & AQUI


Dated: _____, 20__          _____
                                      Diane Aqui
                                      Attorney for Plaintiff


APPROVED AS TO FORM:


Dated: _____, 20__          _____
         Steven Kesten

                                      Attorney for Defendant


                              Page 5 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                        April 17, 2009

<u>PLAINTIFF</u>

Dated: _28 Apr_ , 20_09_                  By: _William E Knight_____
                                              WILLIAM E. KNIGHT, Plaintiff

<u>DEFENDANT</u>

Dated: _____, 20___                    By: _____
                                              ALAN SCHULMAN,
                                              PRESIDENT, DOUBLESHOT, INC.,  defendant


APPROVED AS TO FORM:                       JORDAN & AQUI

Dated: _April 28_ 20_09_                   _Diane Aqui_____
                                           Diane Aqui
                                           Attorney for Plaintiff


APPROVED AS TO FORM:

Dated: _____, 20___                     _____
                                           Steven Kesten
                                           Attorney for Defendant

Apr 30 2009 1:27PM    TOWNEPLACE SUITES         7035698060                P.1

**PLAINTIFF**

Dated: _____, 20__

By: _____
WILLIAM E. KNIGHT, Plaintiff

**DEFENDANT**

Dated: _Qi 30_, 20_09_

By: _____
ALAN SCHULMAN,
PRESIDENT, DOUBLESHOT, INC.,  defendant

APPROVED AS TO FORM:

JORDAN & AQUI

Dated: _____, 20__

_____
Diane Aqui
Attorney for Plaintiff

APPROVED AS TO FORM:

Dated: _4/30_, 20_09_
Steven Kesten

_____

Attorney for Defendant

Page 6 of 5

SETTLEMENT AGREEMENT
Sonoma County Case No. 241748                              April 17, 2009