1    Michael Cohen - #98066
     Bruce E. Krell, Inc. - #52542
2    Jerome M. Garchik - #50562
     LAW OFFICES OF BRUCE E. KRELL
3    Grove Law Building
     345 Grove Street
4    San Francisco, CA 94102
     415/861-4414
5    Fax: 415/431-4526
     mikecohen@sprintmail.com
6
     Attorneys for Plaintiff
7

8           UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA

9    WILLIAM E. KNIGHT,                      No. CV 11 6337 - JST

10         Plaintiff,                        **PLAINTIFF'S REPLY MEMORANDUM OF**
                                             **POINTS AND AUTHORITIES IN SUPPORT**
11   vs.                                     **OF PARTIAL SUMMARY JUDGMENT**

12   DIANE AQUI, MARK D. JORDAN,             DATE: 9/5/13
     Deceased, ESTATE OF MARK. D.            TIME: 2:00 P.M.
13   JORDAN, and DOES 1-100,                 COURTROOM 9, 19th Floor

14         Defendants.
                                    /
15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

1

## TABLE OF CONTENTS

2  TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

3  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

4  Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

5  Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

6  Negligent Misrepresentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

7  Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

8  Joint Venture Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

9  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

TABLE OF AUTHORITIES

2

<u>Cases</u>

3  *Blanks v. Seyfarth Shaw LLP* (2009) 171 CA4[th] 336, 357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

4  *Dalziel v. State Bar* (1936) 6 C2d 433 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 5

5  *Mayhew v. Benninghoff* (1997) 53 CA4th 1365, review denied . . . . . . . . . . . . . . . . . . . . . . . .   3

6  *Williams v. State of California* (1983) 34 C3d 18, 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

7

<u>Jury Instructions</u>

8  CACI 3712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 5

9  CACI 1903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>INTRODUCTION</u>

2
Defendant argues (1) Plaintiff's agreement to the violation immunizes the Defendant; and

3
(2) Defendant was not a Joint Venturer with her Joint Venturer, Mark Jordan, now deceased.

4
As to (1), Defendant fails to deal with the fact that Plaintiff's agreement was induced on

5
the basis of a misrepresentation by Defendant on which Plaintiff had the right to rely since

6
Defendant had the fiduciary and legal obligations to be totally truthful to Plaintiff and competent

7
about Defendant's representations to Plaintiff - especially about the law (and, it should be noted,

8
even if Defendant had no duty to advise Plaintiff about the law, Defendant, undertaking

9
nevertheless to do so, carried the duty to do so competently[1]).

10
As to (2), Defendant fails to submit a single fact sufficient to contradict Defendant's

11
status as a Joint Venturer with her co-counsel in representing Plaintiff.[2]

12

<u>Facts</u>

13
Defendant argues that her co-counsel drafted the subject retainer agreement, and she had

14
no input into it.  Objection, relevance, since, as a Joint Venturer, she had the legal responsibility

15

16

17

18
[1]      " 'In addressing breach of duty, "the crucial inquiry is whether [the attorney's] advice was so legally deficient when it was given that he [or she] may be found to have failed to use 'such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake.' . . ." . . . " ' " *Blanks v. Seyfarth Shaw LLP* (2009) 171 CA4[th] 336, 357.

19
A 'good Samaritan.' . . . is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." *Williams v. State of California* (1983) 34 C3d 18, 23.

20

21

22
[2]      See CACI 3712 Joint Ventures: Each of the members of a joint venture, and the joint venture itself, are responsible for the wrongful conduct of a member acting in furtherance of the venture.

23
You must decide whether a joint venture was created in this case. A joint venture exists if all of the following have been proved:

24
1. Two or more persons or business entities combine their property, skill, or knowledge with the intent to carry out a single business undertaking;

25
2. Each has an ownership interest in the business;

26
3. They have joint control over the business, even if they agree to delegate control; and

27
4. They agree to share the profits and losses of the business.

A joint venture can be formed by a written or an oral agreement or by an agreement

28
implied by the parties' conduct.

1   for the document which was drafted by her Joint Venturer on her behalf.

2        Defendant argues that the statement that "it is anticipated that Double Shot WILL not

3   make any further payments . . . " (EMPHASIS ADDED) is unsupported by evidence and that,

4   "(i)nstead, . . . Mr. Knight has sued the principals of Double Shot . . . to try and collect the

5   remaining settlement payments.  Objections:

6             (1)    The moving papers do not state it is anticipated that Double Shot WILL

7   not make any further payments, only that Double Shot MAY not make any further payments - a

8   fact supported by the evidence that Double Shot HAS NOT made any such payments over a

9   period of years.

10            (2)    Mr. Knight's suit against the principals of Double Shot is irrelevant to the

11  instant case, because the damages in the instant case do not involve any of the remaining

12  settlement payments.

13       Defendant argues that *Dalziel v. State Bar* (1936) 6 C2d 433, should not be stated as a

14  factual matter.  It is a fact relevant herein since, as Plaintiff's attorney advising Plaintiff about the

15  law applicable to Plaintiff's rights regarding money coming to him from the collected parts of the

16  settlement, it is a thing which, at a minimum, Plaintiff's attorney had the duty to know about.

17       Defendant argues that, under the settlement agreement, "all" the settlement payments

18  were not to be sent to Ms. Aqui.  This argument would seem to be directly contradicted by that

19  agreement's language that "All checks shall be mailed to Attorney Diane Aqui, 1612 Fourth

20  Street, Santa Rosa, CA 95404."

21                                  Conversion

22       In short, Defendant argues that it is possible for the retainer agreement to be interpreted in

23  such a way as to allow Defendants to have taken their share of the total settlement amount from

24  the first installment payments as they came in, and before Plaintiff received anything, even if

25  only a small percentage of the settlement amount had been collected/received/realized.

26       Respectfully submitted: It is absolutely undeniable that, in a contract which fails to

27  provide at all for the possibility of an installment settlement, and which refers to the amount

28  "realized" (which word the California Supreme Court has determined, in the instant context, to

mean actually collected), Plaintiff's interpretation of the contract is at least reasonable, such that, even if Defendant's interpretation were reasonable (and, given the extraordinary, Rube-Goldberg-type conniptions the Defendant finds necessary in order to reach such conclusion, it, respectfully submitted, is not), the contract would have to be deemed, at the very least, ambiguous enough to require adoption of Plaintiff's construction.  See, for example, *Mayhew v. Benninghoff* (1997) 53 CA4th 1365, review denied [Doctrine of *contra proferentem*, requiring that ambiguous agreements be construed against drafter, applies with even greater force when person who prepares writing is lawyer].

Defendant then re-states the dazzlingly baffling argument that her Rube-Goldbergian interpretation is bolstered by the fact that her client "went along with it" - because she misrepresented her client's rights to her client.

Defendant ends this section with her argument against *Dalziel, supra*, that, because the contract in *Dalziel* didn't use the word "realized", but used the words "collect" and "discovered", and the *Dalziel* court construed those words to mean "realized", therefore the herein contract which uses the word "realized" is totally and completely distinguishable from *Dalziel*, and that, further, Plaintiff has no legal authority that the word "realized" should be interpreted and applied as synonymous with the words "collect" and "discovered", as the *Dalziel* Court did.  Respectfully submitted, this is an argument (as is the case with most of Defendant's arguments) which refutes itself.

## Negligent Misrepresentation

Defendant argues that "(t)his is simply a disagreement over interpretation of the contract's meaning"[3], so as to allow the contentions that this does not show Defendant's "statement was false or that she did not honestly believe in her interpretation", and that Defendant was acting with a good faith belief.

Had the moving papers herein not expressly set forth the law of Negligent

---

[3]        (essentially continuing to forward its construction of the contract, apparently oblivious to the fact that admitting the disagreement essentially concedes Plaintiff's construction should prevail under the rule of *Mayhew v. Benninghoff, supra*)

Misreprentation directly contrary to Defendant's positions on this issue (CACI 1903), one might not wonder why the Defendant thinks that these positions are not raised in bad faith.  But, just as a reminder:

      1.    It is, respectfully submitted, impossible to assert in good faith that the law set forth in *Dalziell* does not make Defendant's statement to Plaintiff directly to the contrary "false".

      2.    As expressly set forth in CACI 1903, Defendant's honest belief and good faith are irrelevant to the tort of Negligent Misrepresentation.  Rather, they are merely the distinguishing point between Intentional Misrepresentation (which Plaintiff does NOT assert) and Negligent Misrepresentation (which Plaintiff does assert).

Breach of Fiduciary Duty

Defendant's argument is that, since she had a good faith honest belief that the obviously totally erroneous thing she told Plaintiff was true, she therefore can't be liable for breach of fiduciary obligation.

These are simply repetitions of Defendant's unmeritorious arguments made above, refuted by the following:

      a.    As, respectfully submitted, should be obvious: Telling an existing client that a law, which should be well known by every attorney working in this context, is the opposite of what the law actually says, thereby inducing the client to accede in an arrangement with the attorney against the client's interest, constitutes breaches of the fiduciary obligations to know the central rule involved, follow it and not tell the client that the rule is other than it really is, and

      b.    Breach of Fiduciary Obligation includes, among other things, conversion and misappropriation of client funds; and good faith and honest belief that the erroneous information which resulted in the misappropriation is not erroneous does not mitigate those breaches.

Lastly on this point: Plaintiff agrees with the analysis of Defendant's final paragraph on

1  the issue: This is not a fee dispute[4]; and Plaintiff does not assert that Defendant was not entitled

2  to 40%, or that Defendant did not perform the necessary work.  And, although Plaintiff also does

3  not assert that Defendant's negligent misrepresentation of law she had the duty to know was done

4  in bad faith, it is hard to characterize Defendant's, or perhaps rather her insurance defense

5  counsel's, ongoing refusal to recognize the authority of *Dalziel v. State Bar* (1936) 6 C2d 433, as

6  other than in bad faith.

7                             Joint Venture Liability

8          Defendant argues (without saying why) that:

9          A.    The undertaking outlined in the retainer agreement for Defendant and Mr.

10  Jordan to represent the Plaintiff in the underlying case did not constitute a joint venture between

11  Mr. Jordan and Defendant to represent Plaintiff in a single business undertaking,

12          B.    Plaintiff's expert opinion (which establishes that Defendant and Jordan's

13  conduct implied a joint venture by relevant custom and practice) is irrelevant, and

14          C.    Plaintiff has cited no law or evidence the Defendant and Mr. Jordan were

15  engaged in a joint venture.

16          Reminding the Court that, under CACI 3712, a joint venture (in which each member is

17  responsible for the wrongful conduct of the other in furtherance) exists if:

18              1. Two or more persons or business entities combine their property,
    skill, or knowledge with the intent to carry out a single business undertaking;
19              2. Each has an ownership interest in the business;
                3. They have joint control over the business, even if they agree to
20  delegate control; and
                4. They agree to share the profits and losses of the business(; and
21  that:)
                A joint venture can be formed by a written or an oral agreement or by an
22  agreement implied by the parties' conduct:

23  Plaintiff points to the following evidence before the court, which, along with the retainer

24  //

25  //

26

27  _____

28  [4]      (in which, for example, the attorney charged an exhorbitant fee or inflated a fee
    due to billing for tasks not actually performed)

1    agreement itself[5], clearly establishes Joint Venture herein:

2        From Defendant's deposition:

3          7/17-23
4    17     THE WITNESS:  So your question was did we have
     18  any agreement --
5    19     MR. COHEN:  Agreement.
     20     THE WITNESS:  -- about the division of labor in
6    21  the Bill Knight case?
     22     MR. COHEN: Yes.
     23     THE WITNESS:  No.

7

8          8/13-9/8:
   13    Q.   Having worked with other attorneys on numerous
     14  cases, I find that it breaks down all sorts of different
9    15  ways, depending on just the way things fall.
     16     So sometimes I get called into a case, and I
10    17  wind up handling the whole case, with the other attorney
     18  doing very little or nothing.  Sometimes we bat things
11    19  back and forth, and it winds up about 50/50.  And --
     20  there is all sorts of different ways.  Sometimes I do all
12    21  the writing and they do all the appearing; sometimes it
     22  is vice versa.
13    23     Was there anything along that -- those lines
     24  that you could point to that indicated who did what on
14    25  Mr. Knight's case between you and Mr. Jordan?
                8
15    1    A. Um, I don't think so.
     2     Um, we -- whoever was in the office, um, took
16    3  Bill's phone calls.  Um, we both made the court
     4  appearances and appeared at the settlement conference.
17    5     Um, so I don't think that -- you know, we just
     6  both did whatever work was -- I don't think there is any
18    7  real formal agreement or informal agreement.  Whatever
     8  just came up was done.

19

20          13/16-14/10:
   16    Q.   Okay.  So in March of 2007, when Exhibit 1 was
     17  written, there were only the two of you in the office?
21    18    A.  I think so, yes.
     19    Q.   And the general arrangement was referrals back
22    20  and forth or he -- basically he would refer cases to you?
     21    A.  Yes.
23    22    Q.  But this was not one of them?
     23     This was not -- in other words, was this a -- as
24    24  you described it before, it didn't sound to me like this
     25  was a case in which you were paying him a -- the Knight

25

26 ───────────────

27       [5]     (which agreement does nothing to contradict the existence of a Joint Venture between Defendant and Mr. Jordan to work together on herein Plaintiff's case without anything meaningful contrary to the ordinary relationships in such circumstances, but with much to support Joint Venture, especially because of that very ordinariness)

28

13

1 case was a case with which you were paying him a
2 12-percent referral; it sounded like you were basically
3 50/50, I think is what you said.
4     A.   Yeah, I would say that 98 percent of the work
5 that I and Mark have done is defense work, so it is
6 hourly fees.  We don't -- I typically didn't take
7 plaintiffs cases and Mark typically didn't take
8 plaintiffs cases.
9        So this was a little bit of an unusual
10 situation.[6]

   15/6-8:
6     Q.   Okay.  Did you have any writings reflecting your
7 arrangement with Mr. Jordan on the Knight case?
8     A.  No.

   16/22-23:
22     A.   At some point, I would assume that Mark and I
23 decided to take the case together, yes.

   18/12-21:
12        Did you ever communicate with Mr. Jordan about
13 how the fee would be distributed in an installment
14 recovery?
15     A.  No.
16     Q.  So is it fair to say that the first time that
17 the issue came up about how the fee -- in terms of your
18 communicating with anybody, in terms of how the fee would
19 be distributed in an installment payment, would be when
20 Mr. Knight raised the issue with you?
21     A.  I think so.

   22/15-22:
15        You have -- you don't remember one way or the
16 other whether the idea that the attorneys got paid first
17 was discussed at that time that you discussed the
18 installment nature of the offer?
19     A.  Um, I don't remember, but I -- I would assume
20 that it was, because it is an installment --
21     Q.  And --
22     A.  -- payment.

   25/4-6:
4        THE WITNESS:  I believe that there was only one
5 other contingency-fee case that I worked on with Mark,

---

[6]     NB: Defendant's one, even conceivable, argument is that, in general, the business relationship between herself and Mr. Jordan was expressly structured not to be partnership.  The testimony preceding this footnote establishes without a doubt (although it is otherwise more than obvious) that the business relationship involved in the undertaking of Defendant and Mr. Jordan to represent herein Plaintiff in the underlying case had nothing at all to do with that general business relationship.

Reply Memorandum of Points and Authorities in
Support of Motions for New Trial and Reconsideration

6   and that was just, you know, no installment.

26/17-20:
17       Is it correct to say that this case with
18   Mr. Knight is the only case involving an installment
19   payment that you've ever worked, that you can remember?
20       A.   That I can remember as we sit here today, yes.

32/2-14:
2       There was nothing in your -- the way of your
3   communicating with Bill?
4       In other words, you did not -- you can --
5       I am going to use the phrase again, "division of
6   labor."
7       You didn't have an arrangement or agreement with
8   Mark whereby only he or mostly he would communicate with
9   Bill?
10      A.   No.
11      Q.   If you had something to call Bill about, you
12   would talk to him or if Bill wanted to talk to you, no --
13   no big deal?
14      A.   That's correct.

From Plaintiff's expert's deposition:

47/33-48/7:
33   Q.   What do you mean when you say, "They're
34
35   jointly responsible as a matter of custom and practice"?
36
37      A.   I worked on a lot of cases with other lawyers,
38
39   and we work -- you know, the client pays once.   The
40
41   obligation is to the lawyers, whether there's two or
42
43   three or 10 of us.
44
45       If money is owed to the clients, it's up to us
46
47   to squabble among ourselves; but we, as a unit, owe the
48
49   money to the client.   That's the way I would perceive
50
51   it.
52
53   Q.   This is based on your experience and however
54
55                                47
0048
1
2
3
4
5   number of years you've practiced as a lawyer?

_____

Reply Memorandum of Points and Authorities in
Support of Motions for New Trial and Reconsideration

```
 1   6
 2   7    A.   Correct.
                      65/5-66/49
 3   5    Q.   Subparagraph (d) on that page, the second
     6
 4   7  sentence says:
     8
 5   9       "Unless otherwise specified in the
    10
 6  11   contract, the fee due to each are indivisible
    12
 7  13   and unallocated."
    14
 8  15       What's the significance of that comment?
    16
 9  17    A.   My understanding is that the defendants in
    18
10  19  this case are saying, Well, only part of it would be
    20
11  21  owed by me.  If someone else made you a promise, go get
    22
12  23  it from him.
    24
13  25       And I'm basing that again on my experience,
    26
14  27  where I've worked together with many lawyers, many
    28
15  29  times.  And it's never been a separate arrangement where
    30
16  31  the client owed me part of the fee and owed the other
    32
17  33  lawyer part of the fee.  If the fee is a third, it's up
    34
18  35  to the lawyers to divide it up.
    36
19  37       And I point out also what I -- the
    38
20  39  retaining -- the contract doesn't allocate it in any
    40
21  41  way.  It just says that she is -- that he, Mr. Knight,
    42
22  43  is retaining Jordan/Aqui, and there's no allocation that
    44
23  45  he's going to owe one of them for part and the other for
    46
24  47  the other part.
    48
25  49       Again, it's on a contingency.  It's not like
    50
26  51  I'll pay Jordan for the work he does, and I'll pay Aqui
    52
27  53  for the work she does.  It's an unallocated contract.
    54
28  55                        65
```

Reply Memorandum of Points and Authorities in
Support of Motions for New Trial and Reconsideration

0066
1
2
3
4
5      Q.   So are you saying that to the extent that the
6
7   plaintiff is found to be entitled to recovery of some
8
9   portion of what was paid here that either Mr. Jordan or
10
11   Ms. Aqui would be liable for the entire amount?
12
13      A.   That would be my general understanding.  But
14
15   more important is it's between Jordan and Aqui.  In
16
17   other words, if the money that was improperly taken is
18
19   returned to Mr. Knight, as it should be, it's going to
20
21   be up to Mr. Jordan and Ms. Aqui to straighten out who
22
23   is responsible for that, who has already received how
24
25   much.  That's not really the issue from Mr. Knight's
26
27   perspective.
28
29      Q.   Okay.  Is that part of what you've been asked
30
31   to render opinion here about?
32
33      A.   Yes.  Again, not the legal conclusion or the
34
35   law.
36
37        It's the custom and practice which, in my
38
39   experience, when lawyers work together on a contingency
40
41   fee contract, there's one fee, and it's owed to the
42
43   lawyers, and the lawyer -- it's up to the lawyers how
44
45   they want to divide it up.  And so I have to presume
46
47   that if it were going the other way, it would be the
48
49   same rule.

         67/39-68/11:
27   39      THE WITNESS:  I'll clarify.  It's my
     40
28   41   understanding that expert witnesses are not allowed to

_____

42
43   tell the judge what the law is, and so I'm not going to
44
45   do that.
46
47        My role, as I understand it, is to share my
48
49   experience, knowledge, education, training as to how
50
51   lawyers in our community do things.
52
53        And it's my understanding, based on my -- or
54
55                              67
0068
1
2
3
4
5   my opinion, I should say, is that there's an indivisible
6
7   fee owed by the client to the lawyers, and it's a --
8
9   between them.  The custom and practice is for them to
10
11   work it out.  It's not the client's problem.

## CONCLUSION

For the reasons set forth in all his papers herein, Plaintiff repeats his respectful request for Partial Summary Judgment that:

a.   Defendant Diane Aqui is liable to Plaintiff for Professional Negligence;

b.   Defendant Aqui is liable to Plaintiff for Conversion;

c.   Defendant Aqui is liable to Plaintiff for Negligent Misrepresentation;

d.   Defendant Aqui is liable to Plaintiff for Breach of Fiduciary Duty;

e.   Defendant Aqui is liable to Plaintiff for Breach of Contract;

f.   Defendant Aqui is liable to Plaintiff for special damages of $102,300.18, plus interest;

g.   Defendant Aqui's liability to Plaintiff is "joint and several" with her now-

//

//

//

Reply Memorandum of Points and Authorities in
Support of Motions for New Trial and Reconsideration

1   deceased joint venturer in representing Plaintiff.

2   DATED: August 11, 2013                     Respectfully Submitted,

3                                               LAW OFFICES OF BRUCE E. KRELL, INC.

4

5

6

7

8   By_____
                                               Michael Cohen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reply Memorandum of Points and Authorities in
Support of Motions for New Trial and Reconsideration